IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| VICTORIA M. KERN, | CV 05-6084-RE |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| JO ANNE B. BARNHART,<br>Commissioner of Social<br>Security, | |
| Defendant. | |

KATHRYN TASSINARI
DREW L. JOHNSON, P.C.
1700 Valley River Drive
Eugene, OR 97401
(541) 434-6466

       Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1053

1 – OPINION AND ORDER

MICHAEL McGAUGHRAN
Regional Chief Counsel
DAVID M. BLUME
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2156

        Attorneys for Defendant

REDDEN, Judge.

      Plaintiff filed a civil action for judicial review of the Commissioner's final decision denying her applications for disability insurance benefits and supplemental security income benefits (benefits) under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively.  Plaintiff alleges the Administrative Law Judge (ALJ) erred in finding she is not entitled to benefits and seeks an order reversing the Commissioner's decision and remanding the case for an award of benefits.  The Commissioner contends her decision is based on substantial evidence and free from legal error and requests the court to affirm her decision.

      This court has jurisdiction under 42 U.S.C. § 405(g).  For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action.

## BACKGROUND

      This is the second time the Commissioner has denied plaintiff's claim for benefits.  Plaintiff originally made a claim for benefits in October 1998.  On September 23, 2002, I affirmed the decision of the Commissioner denying that claim.

In October and November, 2001, while plaintiff's original claim was still pending in this court, plaintiff reapplied for the same benefits. Plaintiff's application was denied initially and on reconsideration. Plaintiff requested a hearing, which was held on October 6, 2004, before a different ALJ than the one who heard plaintiff's original claim. On December 18, 2004, the ALJ issued a decision that plaintiff was not eligible for benefits. On January 8, 2005, the Appeals Council denied plaintiff's request for review and the ALJ's decision, therefore, became the final decision of the Commissioner for purposes of judicial review.

## **LEGAL STANDARDS**

The initial burden of proof rests on the plaintiff to establish disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). To meet this burden, the plaintiff must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039

(9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

In general, when the Commissioner has denied a claimant's earlier application for benefits, the Commissioner's decision "creates a presumption of non-disability." Schneider v. Commissioner of Social Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). "The presumption can be overcome, however, when the claimant presents evidence of changed circumstances." Id.  An increase in the severity of an impairment or the existence of an impairment not considered in the previous application may constitute such "changed circumstances." Lester v. Chater, 69 F.3d 1453, 1461 (9th Cir. 1995).

## **DISABILITY ANALYSIS**

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled. Bowen v. Yuckert, 482 U.S.137, 140 (1987). See also 20 C.F.R. § 416.920. The claimant bears the burden of proof at steps one through four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). Each step is potentially dispositive.

At Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since the onset of her alleged disability. 20 C.F.R. § 416.920(b).

At Step Two, the ALJ found plaintiff suffers from impairments including

possible fibromyalgia, degenerative disc disease, syringomyelia,[1] history of depression/dysthymia, probable pain disorder associated with plaintiff's general medical condition and psychological factors, history of headaches, history of abdominal pain with diarrhea, status post cholecsystectomy, and use of medical marijuana that, in combination, are considered severe within the meaning of 20 C.F.R. §§ 404.1520(c) and 416.920(b).

At Step Three, the ALJ found plaintiff's severe and non-severe impairments did not meet or equal one of the listed impairments that would preclude substantial gainful activity. See 20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), and §§ 416.920(a)(4)(iii) and (d). Based on those impairments, the ALJ found plaintiff has the residual functional capacity to lift and carry up to 10 lbs. frequently with an occasional 20 lb. maximum, walk up to one block at a time, and climb stairs occasionally. The ALJ also found plaintiff has moderate difficulty operating foot controls with the right lower extremity. Plaintiff should have the opportunity to change position, have ready access to bathroom facilities, and should avoid hazards. Finally, the ALJ found plaintiff has moderate limitations understanding, remembering, and carrying out detailed instructions. Notwithstanding these findings, the ALJ found plaintiff's allegations regarding her limitations were not totally credible and that her "unreliable behavior might even be described as flagrant." Tr. 17.

---

[1] Syringomyelia is a slowly progressing syndrome in which cavities occur in the central spinal cord, predominantly in the cervical area, resulting in segmental muscular weakness and atrophy, accompanied by loss of pain and temperature sensation, but not loss of touch. Thoracic scoliosis is often present. Dorland's Medical Dictionary, 27th Ed. (1988).

5 – OPINION AND ORDER

At Step Four, the ALJ found plaintiff was not able to perform her past relevant work involving light semi-skilled or unskilled work as a cashier, sales clerk, motel stocker, and game attendant.

At Step Five, the ALJ found plaintiff cannot perform the full range of light work but is able to perform a significant range of light work, including the jobs of document preparer, food and beverage order taker, and small products assembler, which jobs exist in substantial numbers in the national and regional economy.

Accordingly, the ALJ found plaintiff was not under a disability. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## DISCUSSION

The ultimate issue is whether plaintiff presented sufficient credible evidence to meet her burden of establishing that her physical and/or mental condition since February 2001 has deteriorated so as to rebut the presumption of non-disability arising from the adverse finding on her first application for benefits and to establish that she is disabled. I agree with the Commissioner that she has failed to meet that burden.

**Evidence.**

The relevant evidence is set forth below.

**Plaintiff's Vocational and Medical History.**

Plaintiff was 33 years old on the date of the final decision denying her second claim for benefits. She has a high school diploma. She has worked in the past as a bingo attendant, motel stocker, and sales clerk/cashier. She last worked in April 1998.

In her original application for benefits, plaintiff claimed she was disabled because

of dizziness, low back pain, headaches, syringomyelia, memory loss, ruptured discs, fibromyalgia, and chronic pain syndrome. The medical record as to that claim is set forth in my first opinion and is not repeated here. See Opinion and Order, at 2-20, issued September 23, 2002. Tr. 62-80.

Plaintiff claims in her renewed application for benefits that she suffers from spinal disease, three bad discs, and fibromyalgia. Tr. 109. The Commissioner does not dispute plaintiff suffers from possible fibromyalgia and that she has degenerative disc disease and syringomyelia.

The relevant period under review began on February 24, 2001, the day after the first ALJ issued her findings on the original application. Plaintiff obtained medical and psychological care, and underwent medical evaluations, from the following sources after that date:

Frederick Weisensee, M.D. - Internal Medicine Specialist.

Dr. Weisensee was a primary treating physician for plaintiff.

In March 2001, plaintiff complained of continuing "chronic low back pain secondary to syringomyelia and degenerative disc disease, radicular." Tr. 303. She was prescribed Vicodin for a "short term." Id. She also received a tender point injection for her fibromyalgia, which resulted in some relief of pain in the area injected. Plaintiff was also treated for continuing bouts of diarrhea.

In May 2001, plaintiff's fybromyalgia flared up in her legs. She had previously been prescribed Amitryptiline, which was helpful in easing the pain. The dosage was increased.

In August 2001, plaintiff complained of continuing weakness in her lower

7 – OPINION AND ORDER

extremities, more so on the right than the left.  Dr. Weisensee found plaintiff's fibromyalgia was stable, but encouraged her to "get more active especially mentally with classes."  Tr. 296.

As of October 2001, the fibromyalgia and syringomyelia were stable, although plaintiff complained of continuing pain in the low lumbar spine, legs, and shoulders, with some swelling in her left arm.

In January 2002, plaintiff complained of pain at a level of eight on a scale of one-to-ten, and Dr. Weisensee referred her to a chronic pain clinic.

In July 2002, plaintiff was more depressed and having suicidal thoughts.  She was "tired of dealing with a lot of pain and does not know where her life is going."  Tr. 293.  Dr. Weisensee prescribed Effexor and suggested cognitive therapy.

In August 2002, plaintiff complained of continuing left-sided low back pain and received a tender point injection.  To treat her depression, Dr. Weisensee increased the the dosage of Effexor and told plaintiff to call Linn County Mental Health.

On August 22, 2002, Dr. Weisensee wrote to Brett R. Stacey, M.D., at the Oregon Health Sciences University Pain Clinic, requesting help in treating plaintiff for "chronic pain maybe related to fibromyalgia and possibly syringomyelia."  Tr. 291.

In September 2002, plaintiff reported that her mood was improved and her pain was better, although she wanted to go to the pain clinic.

By November 2002, plaintiff's depression had stabilized, and plaintiff was walking and stretching for exercise.

In January 2003, after plaintiff had been examined at the OHSU Pain Clinic by Jennifer Vookles, M.D., Dr. Weisensee again recommended plaintiff seek an evaluation at Linn County Mental Health.

In February 2003, plaintiff continued to complain of depression. Dr. Weisensee increased the dosage of Effexor and recommended plaintiff follow up with Linn County Mental Health.

In April 2003, plaintiff told Dr. Weisensee she continued to be depressed and her fibromyalgia flares up and at times is fairly painful. Plaintiff reported she could not go to counseling "because mental health benefits have been cut." Tr. 436.

In June and July 2003, plaintiff complained of increased pain, but it was "not severe enough in the hip that she wants an injection." Tr. 435.

From September through November 2003, plaintiff complained of mood swings and her fibromyalgia continued to cause pain.

During 2004, plaintiff continued to treat with Dr. Weisensee for fibromyalgia, which remained stable, with some improvement in August 2004.

In September 2004, plaintiff told Dr. Weisensee that she was "having trouble with Social Security" and noted that "for the last several weeks she sometimes cannot walk without a cane." Tr. 427. Dr. Weisensee noted "a little bit of weakness on the left side with walking on tiptoes." Id. He again urged plaintiff to contact Linn County Mental Health to address her depression.

On October 5, 2004, Dr. Weisensee wrote a letter on behalf of plaintiff in which

he diagnosed her as suffering from syringomyelia, fibromyalgia, and depression. He added:

> In order to work full-time, she would need a sedentary job with frequent breaks and may miss work 1-3 days a month with medical related flares requiring rest at home. This is my best guess - she may be only able to work 20 to 30 hours a week at best.

Tr. 451.

### Richard A. LaFrance, M.D. - Neurologist.

Dr. LaFrance began treating plaintiff in 1997. He diagnosed syringomyelia following an MRI in 1998, and noted a small central disc herniation at T6-7, disc bulging at T3-4, 4-5, 5-6, 6-7 and 7-8, and a central disc profusion at L4-5, following an MRI in March 1999. Dr. LaFrance continued treating plaintiff on occasion through January 2003.

In April 2001, Dr. LaFrance noted plaintiff had improved since being prescribed vicodin by Dr. Weisensee, although "she is still having the pain and parethesias into her legs that she had been in the past." Tr. 256.

In November 2001, plaintiff continued to complain of pain and paresthesias in her legs but was "no longer at this point requiring either Vicodin or Neurontin, which is bit (sic) plus." Tr. 255.

In December 2001, plaintiff complained of back pain, numbness, and weakness in her right leg but "she is not aware of any specific changes since she was last seen." Tr. 254.

In January 2003, plaintiff stated she felt weak and "has trouble picking up her

right leg and feels more fatigued when walking up and down stairs." Tr. 253. Dr LaFrance noted:

> Lower extremities have some apparent weakness in hip flexors and extensors of the knee. This does not appear apparent, however, whenever she gets up and walks. She can walk on heels and toes, and her overall movement of her legs seems quite normal. Reflex patterns are intact. They are symmetrical. There are no pathological reflexes.

Tr. 253. Dr. LaFrance also noted '[t]here is subjective alteration in sensation in the right lower extremity" and that "it is difficult to fully correlate the level of motor system abnormality with the absence of definable reflex change." Id.

On January 27, 2003, an MRI requested by Dr. LaFrance revealed a "Stable Thoracic Spine MRI without significant change in syringomyelia and mild-multi-level degenerative disc disease." Tr. 394.

<u>Jennifer Vookles, M.D. - Pain Management</u>.

In December 2002, Dr. Vookles, a pain management specialist at OHSU, examined plaintiff on referral from Dr. Weisensee. On examination, Dr. Vookles noted plaintiff had a "calm but flattened affect," a "fairly good mobility" but "appears to drag her leg slightly when ambulating," and a "decreased lordotic curvature of the lumbar spine and moderately decreased range of motion." Tr. 240-241. Dr. Vookles noted plaintiff "did not have her current neurological deficits" when she was examined at OHSU by Dr. Burchiel "4 to 5 years ago." Dr. Vookles opined that plaintiff's "diffuse myofacial pain" was "most likely secondary" to "syringomyelia and significant degenerative changes in her thoracic and lumbar spine." Tr. 241. Dr. Vookles declined "to invoke a diagnosis [of fibromyalgia] at this time."

11- OPINION AND ORDER

<u>Terrance A. Hill, M.D. - Gastroenterologist</u>.

During the spring and summer of 2001, Dr. Hill treated plaintiff for chronic abdominal pain and diarrhea following the surgical removal of her gall bladder in February 2001.  Tr. 215-251.

In January 2004, Dr. Hill performed an upper panendoscopy and multiple biopsies of plaintiff's gastrointestinal tract to determine the cause of plaintiff's complaints of chronic abdominal pain and diarrhea.  TR. 395-410.  The upper gastrointestinal tract appeared normal.  The biopsies showed mild chronic gastritis only in the lowest part of the stomach.  Tr. 411.  Dr. Hill advised plaintiff that the previous gastritis "has been nicely controlled" and that he was "not finding anything which allows me to feel I have a handle on your periodic severe intermittent complaints."  Tr. 411.

<u>Lisa Sjodin, M.D. - Psychiatrist</u>.

In January, 2002, Dr. Sjodin examined plaintiff on behalf of the Commissioner. Dr. Sjodin did not review any medical records.  Her diagnosis was dysthymic disorder, adjustment disorder with depressed mood, and probable pain disorder associated with a general medical condition and psychological disorders.  Tr. 208.

**Plaintiff's Testimony.**

At the hearing in October, 2004, plaintiff testified about the worsening of her impairments since February, 2001.

Plaintiff stated her headaches were worse. TR. 471.  She gets headaches at least once or twice a week and they last for three to four days.   When she gets the headaches, she has to rest in bed.  Tr. 472-473.  The headaches have been "at that

level of severity" for "at least five years," and she acknowledged that the headaches "were pretty much the same as we had at the last hearing."  Tr. 473.

Plaintiff testified that "most of the time" she cannot feel her right leg and foot. Tr. 471.  She elaborated that "most of my [right] leg I can't feel.  Either its numb or its really hurting," and that condition started giving her problems "back in '96/'97."  Tr. 474.

Plaintiff stated that after the removal of her gall bladder in February 2001, she has taken medication for stomach pain and "has to stay close to a bathroom" because of diarrhea.  Tr. 476.

Plaintiff acknowledged that, for the past three and one-half years, she has to lay down six hours during normal waking hours of each day.  Tr. 477-479.

Plaintiff testified that "suicide's in my mind every day" because of the pain and "all the problems I have, dealing with it."  Tr. 483.

In summary, plaintiff stated "I just know I've gotten worse than I have in the last couple years."  Id.

**Testimony of Plaintiff's Mother.**

Plaintiff's mother testified that she has observed plaintiff's condition getting gradually worse "almost on a daily basis" since February 2001.  Tr. 485.  She stated that plaintiff watches a lot of television and tries to read, but "her attention span . . . shorter than it was even a year ago."  Tr. 487.  According to her mother, plaintiff has had to give up "all the other things she used to do," including "fishing with her brother," and going to the movie theater, and grocery shopping "even . . . wears her out."  Tr. 489.

13- OPINION AND ORDER

**Vocational Expert's Testimony.**

The vocational expert testified that a person who needed to lay down at various times for up six hours during the eighteen waking hours of the day, i.e., one-third of an eight-hour work shift, would be precluded from competitive employment. Tr. 494.

**Analysis.**

Plaintiff contends the above evidence, if accepted, establishes that her neurologic condition has worsened since February 2001. She asserts the ALJ implicitly recognized that change in circumstance by finding plaintiff no longer could engage in her past relevant work as a game attendant, contrary to the ALJ's finding in February 2001, that plaintiff could still do her former job as a bingo floor manager. In addition, the above evidence, if accepted, establishes plaintiff is disabled in light of the vocational expert's testimony that plaintiff's limitations would preclude her from obtaining competitive employment.

Plaintiff asserts the ALJ: (1) improperly rejected plaintiff's testimony that her condition had worsened since February 2001; (2) improperly rejected the opinion of treating physician, Frederick Weisensee, M.D., regarding plaintiff's work limitations; (3) failed to give adequate consideration to the testimony of plaintiff's mother regarding plaintiff's physical limitations; and (4) lacked substantial evidence to support the finding that plaintiff can perform "other work" in the national economy.

**1. Rejection of Plaintiff's Testimony.**

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be

expected to produce'" the symptoms alleged. (the Cotton test).  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991)(quoting 42 U.S.C. § 423(d)(5)(A) (1988)).  See also Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The claimant need not produce objective medical evidence of the symptoms or their severity.  Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the claimant has met the standards set out in the Cotton test and there is no affirmative evidence to suggest the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regarding the severity of her symptoms.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  See also Smolen, 80 F.3d at 1283.

To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  Id. at 1284 (citations omitted).

Here, there is no affirmative evidence of malingering by plaintiff.  The issue, therefore, is whether the ALJ gave clear and convincing reasons for not crediting plaintiff's testimony.  I find he did.

When plaintiff's first application was denied, the ALJ rejected plaintiff's testimony regarding the severity of her physical and mental impairments based on her lack of

credibility. I found no error in that case, and agreed with the ALJ that plaintiff's testimony was not entirely credible in light of the absence of clinical findings to support her subjective complaints, inconsistencies in plaintiff's testimony and in her reports to doctors, numerous findings by mental health practitioners of somatization, and the absence of any pain regimen or therapy program. Tr. 90-95. The ALJ in this matter incorporated by reference in this case my reasons for making that finding. Tr. 17. Although plaintiff's testimony here deals with the worsening of her condition since that first hearing and, therefore, is not the same, and the medical records pertain to a different time period, I find the same factors again justify the ALJ's incredulity.

The only significant evidence supporting plaintiff's contention that her impairments have worsened since her first application for benefits was denied is her testimony and that of her mother. The ALJ, in rejecting that testimony, referred to plaintiff's "unreliable behavior" as "flagrant." Tr. 17. The ALJ identified specific medical records, which "continue to show a pattern of various reported pain symptoms with uncertain diagnoses." Tr. 18.

In 2001, Dr. Weisensee examined plaintiff in connection with her continuing complaints of weakness, primarily in the lower right extremity. He noted the exam was "inconsistent" and that plaintiff's "complaints of weakness" were difficult to evaluate by exam." Tr. 296. In 2004, Dr. Weisensee noted plaintiff's fibromyalgia was "stable."

In 2003, Dr. LaFrance examined plaintiff about her complaint of feeling weak in the right leg and having problems with stairs and picking up her right leg. Dr LaFrance was unable to detect any abnormal reflexes, and noted plaintiff "could walk on heels

and toes, and her overall leg movement seemed quite normal." Tr. 19.

In 2001, after plaintiff's gallbladder was surgically removed, Dr. Hill reported "the etiology of the [plaintiff's] complaints [of ongoing epigastric discomfort] after eating is not really clear." Tr. 18.

Three years later, Dr. Hill continued to have difficulty finding an explanation for plaintiff's ongoing stomach problems, noting that recent tests failed to give him "a handle on [plaintiff's] periodic severe intermittent complaints," and also that plaintiff's gastritis was "nicely controlled." Tr. 19.

The ALJ also noted that plaintiff's credibility was in question because she failed to follow up on repeated requests by Dr. Weisensee over a two year period that she seek treatment for her depression at Lane County Mental Health. Tr. 19.

On this record, I find the ALJ gave clear and convincing reasons for rejecting plaintiff's testimony. I agree that plaintiff has continued a pattern of making complaints of severe pain and asserting limitations related to physical impairments that are inconsistent with objective medical findings. As a result, her description of her physical limitations is not entirely credible.

**2.    Rejection of Dr. Weisensee's Opinion**.

Dr. Weisensee, plaintiff's treating physician, opined that plaintiff could "work full-time only in a sedentary job with frequent breaks" and that she might "miss work 1-3 days a month with medical related flares requiring rest at home. This is my best guess - she may be only to work 20 to 30 hours a week at best." Tr. 451. The ALJ rejected Dr. Weisensee's opinion.

17- OPINION AND ORDER

"An ALJ may reject the uncontradicted medical opinion of a treating physician only for clear and convincing reasons supported by substantial evidence in the record. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).

Among the reasons the ALJ gave for rejecting Dr. Weisensee's opinion are (1) the opinion was only the doctor's "best guess," which reflects "uncertainty" in the opinion, (2) the opinion was based in large part on plaintiff's "subjective reporting," which were not entirely credible, and (3) other consulting physicians and psychologists had the benefit of reviewing a more comprehensive file than Dr. Weisensee and they concluded plaintiff was capable of light work and/or had mild restrictions of activities of daily living.  Tr. 22, 354-361, 367-380.

On this record, I find the ALJ gave clear and convincing reasons for rejecting Dr. Weisensee's opinion regarding plaintiff's physical work limitations.  Dr. Weisensee's assessment appears to have been based, in large part, on plaintiff's subjective complaints, which are not entirely credible.

**3. Failure to Consider Mother's Testimony.**

Plaintiff's mother testified that plaintiff's condition had worsened over time and that plaintiff had given up recreational and other activities of daily living that she used to do because of her physical deterioration.

Lay testimony as to a claimant's symptoms "is competent evidence that an ALJ must take into account," unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  One reason for which an ALJ may discount lay testimony is

that it conflicts with medical evidence. Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.1984).

Here, the ALJ did not reject the lay testimony of plaintiff's mother. To the contrary, he "accepted" the mother's testimony "as descriptive of [her] perceptions, but it does not provide sufficient support to alter the residual function capacity arrived at herein." Tr. 21.

On this record, I find the ALJ adequately took the mother's testimony into account, but it was not sufficient to alter his finding, based on the medical records and plaintiff's testimony, including the inconsistencies between the two, that plaintiff retained the ability to engage in light work.

### 4. Vocational Expert Testimony - Other Work in the National Economy..

Plaintiff asserts the vocational expert agreed that plaintiff would not be able to work in competitive employment in the national economy if she needed to lay down for one-third of the waking hours in a day, as she testified, and/or if she would likely miss three or more days per month, as Dr. Weisensee reported. In addition, plaintiff asserts the ALJ should have included in the hypothetical the fact that plaintiff has borderline intelligence and cognitive limitations, as reflected by Dr. Greenough's psychological report, which was included in the original record but not in this record.

Accordingly, plaintiff asserts the Commissioner failed to meet her burden of establishing there was "other work" in the national economy that plaintiff could perform.

An ALJ must propose a hypothetical [to a vocational expert] that is based on medical assumptions supported by substantial evidence in the record that reflects each

of the claimant's limitations. <u>Osenbrock v. Apfel</u>, 240 F.3d 1157,1163 (9th Cir. 2000).

Here, the ALJ properly rejected evidence of the physical limitations that plaintiff now asserts should have been included in the hypothetical question to the vocational expert because the evidence supporting those limitations was not credible.

Finally, plaintiff's cognitive and intellectual limitations may have been part of the record in the prior hearing, but as plaintiff acknowledges, medical evidence supporting those limitations were not part of the record here.  In any event, as reflected in my opinion affirming the Commissioner's original denial of benefits, the several tests administered by Dr. Greenough "revealed that [plaintiff] had borderline to average intellectual functioning with no indication of a learning disability," and Dr. Greenough did not "find any personality features of sufficient severity to prevent [plaintiff] from returning to work. . . ."  Tr. 67.

On this record, I find the ALJ's hypothetical question to the vocational expert was based on medical assumptions supported by substantial evidence in the record.

## CONCLUSION

For these reasons, the Court **AFFIRMS** the final decision of the Commissioner and **DISMISSES** this action.

IT IS SO ORDERED.

DATED this 6th day of March, 2006.

        /S/ James A. Redden
        James A. Redden
        United States District Judge